**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **IN RE:** | **CHAPTER 11** |
| **ENTRUST ENERGY, INC.,** *et al.,*[1] | **CASE NO.: 21-31070** |
| **Debtors.** | **(Joint Administration Requested)** |

**DECLARATION OF C. ALEXIS KEENE IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, C. Alexis Keene, declare as follows:

1.      I am the President and Chief Executive Officer ("CEO") of Entrust Energy, Inc. (f/k/a Retail OPCO of Texas, Inc.), Entrust Treasury Management Services, Inc., Entrust Energy East, Inc. (f/k/a North Eastern States, Inc.), Power of Texas Holdings, Inc., Knocked Corp. (f/k/a Enserve Solutions, Inc.), Akyta Holdings, Inc., Akyta, Inc. (f/k/a Enfiniti Global, Inc. and SPH MLM, Inc.), Enserve, Inc. (f/k/a Akyta Services, Inc.), Energistics, Inc., SPH Investments, Inc., Akyta IP, Inc., Surge Direct Sales, Inc. (f/k/a Entrust Sales Solutions, Inc. and SPH D2D, Inc.), Entrust Energy Operations, Inc. (f/k/a Retail OPCO Operations, Inc.), all of which are direct or indirect subsidiaries of Strategic Power Holdings, LLC ("SPH").  I am also an authorized officer of SPH and NGAE, Inc. (f/k/a Entrust Energy Holdings, Inc. and Strategic Power Holdings Operations, Inc.) ("NGAE").

2.      I am an authorized officer for purposes of executing all documents in connection with the filing of the above-captioned debtors (collectively, the "Debtors") bankruptcy petitions and related documents.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Entrust Energy, Inc. (2194); Entrust Treasury Management Services, Inc. (2347); Entrust Energy East, Inc. (3446); Power of Texas Holdings, Inc. (8159); Knocked, Corp. (0195); Akyta Holdings, Inc. (7696); Enserve, Inc. (9111); Akyta, Inc. (7560); Energistics, Inc. (3460); SPH Investments, Inc, (0271); Akyta IP, Inc. (8798); Surge Direct Sales, Inc. (7225); Entrust Energy Operations, Inc. (7479); Strategic Power Holdings, LLC (7069); NGAE, Inc. (1888). The Debtors' mailing address is Entrust Energy, Inc., 1301 McKinney Street, Suite 2950, Houston, TX 77010.

3. In my capacity as President and CEO and an authorized officer of SPH and NGAE, I am familiar with the Debtors' businesses, day-to-day operations, and financial affairs.

4. On March 30, 2021, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5. I submit this declaration ("Declaration") in support of the Debtors' voluntary petitions for relief, and the motions filed requesting "first day" type relief (collectively, the "First Day Motions"). I am authorized to submit this Declaration on behalf of the Debtors.

6. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees and consultants working under my supervision, or my opinion based on experience, knowledge, and information concerning the Debtors' operations and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

A.     **The Debtors' Business**

7. Entrust Energy Inc. ("Entrust") is a Texas corporation formed in or around August 2010. Entrust, together with its affiliates, is a retail energy company delivering electricity and natural gas to homes and businesses in deregulated markets throughout the United States.

8. Entrust and its direct or indirect subsidiaries and affiliates of SPH are headquartered in Houston, Texas and served consumer and commercial customers throughout Texas as well as Illinois, Maryland, New Jersey, New York, Ohio, and Pennsylvania for more than a decade.

9. With a focus on personalized customer service and straightforward pricing plans, Entrust experienced significant growth from its inception and was once recognized as Houston's fastest growing retail energy provider according to the Houston Business Journal.

B.     **The Shell Global Agreement and Loan**

10.     As a necessary component of the Debtors' operations prior to the Petition Date, the Debtors entered into a series of agreements with Shell Energy North America (US), L.P. and other Shell-related entities (collectively, "Shell") for the purchase and sale of physical and financial electrical energy and related services, and to provide credit support arrangements for Debtors.

11.     On July 1, 2014, the Debtors and Shell entered into that certain Amended and Restated Global Agreement (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "Global Agreement"), to govern the parties' business relationship. In connection with the Global Agreement, the Debtors entered into that certain Amended and Restated Loan Agreement, dated as of July 1, 2014, (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), which provided the Debtors with revolving credit to fund their growth and ongoing operations (the "Shell Loan"). The Shell Loan is secured by certain of the Debtors' assets pursuant to that certain Amended and Restated Security Agreement, dated as of July 1, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof). In addition, Strategic Power Holdings LLC, as owner of all outstanding equity interests of the Debtors pledged certain of the Debtors' equity interests in favor of Shell pursuant to that certain Pledge Agreement, dated as of July 31, 2019. As of the Petition Date, by Shell's calculations, Shell is holding in excess of $60 million from termination of the Debtors' hedges, and the Debtors owe Shell approximately $52 million. By Shell's calculations, Shell acknowledges it owes the Debtors more than $8 million. The Debtors are awaiting further information from Shell and are currently investigating Shell's calculations.

12.     As the Debtors grew and explored diversification opportunities such as expansion of its broker business, IT service business, and consulting business, the Debtors' selling, general and administrative expenses steadily increased.

13.     In 2018, as selling, general, and administrative costs increased by approximately $15.5 million, multiple extreme weather events negatively impacted the Debtors' costs which ultimately led to Shell, the Debtors' primary secured creditor, to issue a default notice on or about April 30, 2019 claiming that the Debtors were out of compliance with the financial metrics required under the Global Agreement and Shell Loan.

14.     In order to continue the existing relationship with the Debtors, Shell required several changes, including the following: (i) the Debtors would recapitalize their business with a $10 million capital infusion; (ii) the Debtors would self-fund their operating and capital expenditures going forward; and (iii) all existing losses funded under the Shell Loan would be separated into a separate term loan to be amortized over three years.

15.     Unable to find other suitable capital within the timeframe required by Shell, certain of the shareholders of NGAE and SPH, Nippon Gas Co., Ltd. and Nippon Gas USA, Inc. (collectively, "Nippon"), agreed to loan the Debtors a total of $10 million.  In July 2019, Nippon established a $10 million letter of credit of which $5 million was drawn in July 2019 and the remaining $5 million was drawn in February 2020.

16.     Notwithstanding the Debtors' efforts to improve their balance sheet and financial metrics to the satisfaction of Shell, Shell issued another default notice on March 16, 2020 declaring a default due to the Debtors failure to meet the net worth calculation under the Global Agreement and Shell Loan.  In connection with the alleged default, Shell again required the infusion of $10 million in capital.

17.     Unable to find additional capital as Nippon had just contributed $10 million, the Debtors began exploring a sale of some of their assets to pay down their debt to Shell.

18.     Shortly thereafter, on July 1, 2020, the Debtors closed on a sale of 35,200 residential customer equivalents ("RCEs") to US Retailers LLC, which resulted in approximately $13.2 million in sale proceeds ("NRG Sale").

19.     The NRG Sale dramatically improved the Debtors' financial position and brought the Debtors back into compliance with all financial metrics under the Global Agreement and Shell Loan.

**C.     Impacts of the February 2021 Weather Event**

20.     Heading into February of 2021, the Debtors remained in compliance will all financial metrics under the Global Agreement and Shell Loan. Unfortunately, on or about February 13, 2021 a historic blast of arctic weather engulfed the state of Texas, producing abnormal sub-freezing temperatures for multiple days. It was widely reported that this extreme weather event caused electric generation equipment and natural gas pipeline equipment to freeze or stop functioning, causing the available generation within the market operated by the Electric Reliability Council of Texas Inc. ("ERCOT") to dramatically decline.

21.     ERCOT's CEO, Bill Magness, acknowledged that during this time ERCOT's entire grid system was only minutes away from complete failure. As a result of the crisis, the Public Utility Commission of Texas ("Texas Utility Commission") instructed ERCOT to set record high prices for electricity including substantial ancillary fees for several days.

22.     The consequences of these events had a devastating effect on all retail energy providers in the State of Texas, including the Debtors.

23.     Only one day into the historic and extreme weather event, Shell attempted to have the Debtors agree to a mutual termination of their agreements. When the Debtors did not agree, Shell notified the Debtors that it was declaring a default under the Global Agreement and would no longer transact with the Debtors ("Termination Notice"). The Termination Notice states:

> As evidenced by the POTX forecast and hedge report provided today by Entrust to Shell, Entrust is in material default of the hedging requirements of Section 3.17 of the Global Agreement, thereby causing an Event of Default with respect to Entrust under the Global Agreement.  Due to the current extreme weather event, Entrust's failure to maintain hedges as required by the Global Agreement has resulted in, or will result in, expected losses to Entrust in excess of $40 million, making Entrust deeply insolvent and no longer financially viable, and Shell can no longer risk increasing its exposure to Entrust.

24.     The combination of ERCOT's failure to appropriately safeguard the grid from systematic failure during extreme winter weather and Shell's unilateral termination of the Global Agreement based on its expectation that the Debtors hedges were inadequate eliminated the Debtors' ability to continue as a going concern.

25.     Immediately following the Termination Notice given to Entrust, Shell terminated hedges which Shell acknowledges were adequate to pay all amounts owed to Shell under the Global Agreement, Shell Loan, and other amounts owed to Shell under their related contracts.

26.     The Debtors have been actively communicating with Shell for weeks regarding an accounting of the funds collected and application of those funds. Preliminary reports from Shell indicate that Shell owes the Debtors well in excess of $8 million, but despite numerous efforts to seek more definitive documentation around mark-to-market valuations and evidence of each liquidating trading settlement activity, Shell has not yet provided complete backup documentation requested by the Debtors to verify the initial accounting reconciliation of the funds provided by Shell. The Debtors are still investigating Shell's termination of the Global Agreement and related

agreements as well as the amounts they are owed in connection with the early and unilateral termination of their hedges at the onset of the extreme weather event in Texas.

**D.     The Debtors Efforts to Maximize Value**

27.     After receiving the Termination Notice and confirming discussions with Shell, the Debtors immediately sought to expedite the sale of their remaining customers to other retail energy providers ("REPs") in order to maximize value to creditors and limit the number of customers that would be transitioned to a provider of last resort ("POLR").

28.     Around the same time, the Debtors began searching for an experienced executive in the retail energy field. I previously served as the general counsel of Spark Energy and SVP & General Counsel of EDF Energy Services and have approximately 6 years of experience in the energy industry.  The Debtors hired me in my current role as President and CEO in approximately February 2021.

29.     Additionally, the board of directors of all Debtors, except SPH and NGAE, appointed Ms. Anna Phillips as an independent director because Ms. Phillips has no prior or existing relationship with the Debtors, the Debtors' shareholders or creditors in which there is a foreseeable conflict in these cases. Ms. Phillips has extensive restructuring experience in the energy sector and has acted as an independent director in numerous restructuring and bankruptcy matters.

30.     As a result of the Debtors efforts, on March 10, 2021, the Debtors closed on a sale of approximately 91,000 commercial and residential RCEs and other assets, including certain systems and intellectual property to Rhythm Ops, LLC which resulted in $3.160 million of sale proceeds ("Rhythm Sale"). Following the closing of the Rhythm Sale, 16 of the Debtors' employees were hired as full-time employees or consultants with Rhythm, thereby eliminating the

need to include such employees in future reduction-in-force, which represented an approximate savings of $163,000.

31.     Following the Rhythm Sale, the Debtors still had approximately 13,000 customers (or approximately 90,000 RCEs) and continued efforts to find a purchaser for its remaining customer relationships.

32.      On March 3, 2021, the Debtors received a letter of intent from JP Energy Resources, LLC to purchase a significant portion of the Debtors' remaining customer relationships (the "JP Resources LOI").  Within hours after receiving the JP Resources LOI, the Debtors notified ERCOT of its receipt of the JP Resources LOI and requested one week to close the sale. A client services representative from ERCOT indicated that a week may be too long, but that they would follow up with the appropriate decision maker. The next communication the Debtors received from ERCOT was later that same day informing the Debtors that they were in material breach the Standard Form Market Participation Agreement between ERCOT and the Debtors and that ERCOT planned to transition the Debtors' existing Texas customers to the POLR program.

33.     Further requests by the Debtors for ERCOT to reconsider were dismissed, which effectively terminated the Debtors' ability to consummate a sale under the JP Resources LOI.

**E.     Relief Sought in the First Day Pleadings to Maintain the Debtors' Business.**

34.     Concurrently with the filing of their chapter 11 cases, the Debtors are also filing a number of First Day Motions requesting relief on an emergency basis.

35.     I have reviewed each of the First Day Motions, including the attachments thereto, and I believe that the relief sought in each of the First Day Motions is tailored to meet the goal of continuing the Debtors' operations in an efficient and value maximizing manner during the transition into these chapter 11 cases.

36.     The basis for seeking the relief in the First Day Motions is described in more detail

below:

a.     **Joint Administration:** The Debtors have filed a motion requesting entry of an order directing the joint administration of the Debtors' chapter 11 cases for procedural purposes only. I believe the joint administration of these chapter 11 cases will dispense with the need for duplicative notices, motions, applications, hearings, and orders and will save the Debtors and interested parties considerable time and expense. I believe the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors, and it will make the Debtors' transition into chapter 11 smoother, less costly, and more orderly.

b.     **Motion to Use Cash Collateral:** The Debtors have filed an emergency motion requesting the authority to use cash collateral on an interim basis pending a final hearing. As a practical matter, the Debtors require the use of cash on hand in order to continue operations, pay employees, and allow for a successful transition into these chapter 11 cases. As explained in more detail above, the Shell Loan was previously secured by certain of the Debtors' assets. As of the Petition Date, by Shell's calculations, Shell is holding in excess of $60 million from termination of the Debtors' hedges, and the Debtors owe Shell approximately $52 million. By Shell's calculations, Shell acknowledges it owes the Debtors more than $8 million. The Debtors are awaiting further information from Shell and are currently investigating Shell's calculations. Accordingly, the Debtors do not believe that Shell will have a right to seek any additional cash in the Debtors' possession and are adequately protected by the amounts in their possession. I am unaware of any other creditors that have a perfected lien in the Debtors' cash. In an abundance of caution, however, the motion proposes to provide replacement liens on the Debtors' cash to creditors (if any) that had a perfected lien on the Debtors' cash to the same extent, priority, and validity as those liens existed on the Petition Date. I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

c.     **Motion to Pay Prepetition Employee Obligations:** The Debtors have filed an emergency motion requesting the authority to pay certain pre-petition obligations due to the Debtors' employees. The Debtors request authority pay the employees' pre-petition wages and honor certain employee policies (for example, paid time off, severance, health and welfare obligations, and retirement plan obligations). The Debtors' next payroll date is April 9, 2021, and it is critical to the Debtors' ability to continue operations that they pay their employees on that date. If the Debtors are not permitted to fulfil their obligations to employees, the employees will not receive full payment for services that have already been performed. I believe such a result would undermine the morale and loyalty of the Debtors' workforce, and substantially jeopardize the Debtors' bankruptcy efforts.  I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

d.   **Motion to Continue Use of Cash Management System:** The Debtors have filed an emergency motion requesting that the Court authorize the Debtors to continue using their pre-petition cash management system, including existing bank accounts and business forms. The motion also requests the authority to continue certain intercompany arrangements and historical practices. The Debtors maintain a cash management system in the ordinary course of the Debtors' businesses. This system allows the Debtors to identify the Debtors' cash requirements, transfer cash as needed, forecast cash needs, maintain accounting records, and pay necessary expenses. I believe that discontinuing the use of the Debtors' existing cash management system would require a significant amount of time and effort and could negatively impact the Debtors' ability to efficiently fund necessary expenses, continue operations, and pay vendors. Requiring the Debtors to discontinue the use of its cash management system would be expensive, impose administrative burdens on the Debtors, and cause undue disruption to the Debtors' operations. These negative results would ultimately adversely affect the Debtors' ability to maximize the value of their estates for the benefit of all interested parties. I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

e.   **Key Employee Retention Program:** The Debtors have filed an emergency motion requesting the Court authorize the Debtors' non-insider key employee retention plan ("Non-Insider KERP"). Over the last several months, the Debtors have substantially reduced their workforce. The Non-Insider KERP provides for monthly retention payments for the Debtors' remaining 13 employees. These remaining employees are critical to the Debtors' ability to navigate these bankruptcy cases and maximize potential returns to creditors. These employees have an intimate understanding of the Debtors' business operations and it would be difficult or impossible to replace these people without incurring substantial costs, and it would be difficult or impossible to replace the institutional knowledge possessed by some of the remaining employees. In considering the amount of the employees' retention payments under the Non-Insider KERP, I considered each employee's job functions, skill profile, experience in the industry, and the critical nature of their services. The total monthly retention payments are currently estimated at $15,900 for the month of April and will likely be reduced as the Debtors continue to downsize their workforce going forward. The loss of the employees participating in the Non-Insider KERP would disrupt the Debtors' work processes and cause the Debtors to lose important employee knowledge at the same time the Debtors are seeking to navigate these bankruptcy cases. In my opinion, the Non-Insider KERP is an appropriately tailored retention program for the Debtors' remaining workforce. I believe the design and cost of the Non-Insider KERP are reasonable given the facts and circumstances.  I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

f.   **Notice and Claim Procedures:** The Debtors have filed an emergency motion requesting the Court approve certain notice and claim procedures and a proof of

claim deadline, including for § 503(b)(9) claims. I believe it is necessary for the Debtors to ascertain the universe of claims asserted against them and begin the claim resolution process as soon as possible. I understand that the notice and claim procedures are designed to provide notice to interested parties while avoiding unnecessary administrative expenses. I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

g. **Limit Notice**: The Debtors have filed an emergency motion requesting approval of limited service on certain matters in these bankruptcy cases and an opt-in procedure for parties who wish to receive additional service. I understand that limiting service and the opt-in procedure will allow interested parties to receive notice of matters in these bankruptcy cases while avoiding unnecessary administrative expenses. I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

h. **Claims Agent:** The Debtors have filed an emergency motion requesting the Court approve the Debtors' retention of BMC Group, Inc. as a claims and noticing agent. I believe the retention of a claims and noticing agent is necessary primarily to (i) handle the significant burden of noticing interested parties, including the Debtors' former customers and (ii) handle the potentially voluminous proofs of claim filed in these Chapter 11 cases. I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

i. **Utilities:** The Debtors have filed an emergency motion requesting that the Court determine that the Debtors have provided adequate assurance of payment for certain utility services and preclude these utility services from altering, refusing, or discontinuing utility services. The Debtors receive utility services from four companies who provide the Debtors with internet, phone, electronic badge, and printer services. The monthly average cost of these utility services combined is approximately $4,525. In my opinion, the continuity of these utility services is essential for the Debtors' continued operations and to prevent damage to the value of the Debtors' estates. Given the Debtors' substantial cash reserves, I believe a deposit of one-half of the Debtors' monthly average combined utility bill is appropriate adequate assurance of payment for these utility services. I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors.

37.    I also believe that it is critical that the First Day Motions be heard as soon as practicable.  If the First Day motions are not considered on an expedited basis, it could threaten the Debtors' ability to satisfy their obligations to, among others, employees, customers, and suppliers. The impact of such a stoppage would be immediate and irreparable to the Debtors' business.  Accordingly, I believe expedited consideration and approval of the First Day Motions

is vital to the continued viability of the Debtors and is in the best interest of all of the Debtors' respective stakeholders.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Dated:  March 30, 2021

C. Alexis Keene, President and CEO