United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 06, 2023

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 21-31070** |
| **ENTRUST ENERGY, INC.,** *et al.,* | § | |
| | § | **CHAPTER 11** |
| Debtors. | § | |
| | § | |
| **ENTRUST ENERGY, INC.,** *et al.,* | § | |
| , | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 21-3930** |
| | § | |
| **SHELL ENERGY NORTH AMERICA** | § | |
| **(US), L.P.,** *et al.,* | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

The trustee of the Liquidating Trust in the Entrust chapter 11 bankruptcy filed this adversary proceeding, claiming damages from Shell's allegedly improper termination of its agreements with Entrust during Winter Storm Uri. (ECF No. 154 at 2). Shell filed a motion to dismiss some of Entrust's claims. (ECF No. 157). Shell asks the Court to dismiss Entrust's allegation that it was the Non-Defaulting Party under the EEI Master Agreements (collectively, the "EEI"). (ECF No. 157 at 6). Shell further asks to dismiss Counts II through VII in their entirety. (ECF No. 157 at 6). For the reasons stated below, the Court denies the motion to dismiss Entrust's allegation that it was the Non-Defaulting Party under the EEI, but grants the motion to dismiss Counts II through VII.

## BACKGROUND

The parties dispute whether Shell improperly terminated its contractual relationship with Entrust during Winter Storm Uri under the terms of the parties' agreements. Resolving that issue

requires an understanding of the terms of the parties' agreements and the parties' actions during Winter Storm Uri.

I.   THE AGREEMENTS

Entrust Energy was a Texas-based retail energy company.  (ECF No. 154 at 6).  Prior to Uri, Shell and Entrust entered into agreements memorializing an energy financing and supply arrangement in which Shell would provide both financial services and a supply of energy to Entrust.  (ECF No. 154 at 7).  Agreements effective as of July 31, 2019 memorialized this relationship between the parties.  (ECF No. 154 at 8).  The agreements relevant to this dispute are the Global Agreement and the EEI Master Agreements.

The Global Agreement governs the contractual relationships between the counterparties in relation to the various other agreements, such as loan and energy supply agreements.  (ECF No. 154 at 7).  The EEI agreements were entered into pursuant to the Global Agreement.  They are central to this adversary proceeding.  (ECF No. 154 at 9).  Each EEI obligated Shell to sell electric power to Entrust for use in its retail energy business.  (ECF No. 154 at 9).  The EEI is an industry-standard form with a cover sheet which the parties used to add to or amend some of the form's terms.  (ECF No. 154 at 9).  According to Entrust, the structure created by the Global Agreement and EEI enabled Entrust to purchase energy at a fixed rate to reduce the risk of exposure to fluctuations in purchase costs from ERCOT-controlled markets.  (ECF No. 154 at 9).

The Global Agreement required Entrust to report information concerning its financial affairs to Shell on an ongoing basis.  (ECF No. 154 at 9-10).  This included periodic reporting on updates to its Risk Policy.  (ECF No. 154 at 10).  Section 3.17 of the Global Agreement required Entrust to adopt and comply with a Risk Policy and restricted modifications to it absent Shell's consent.  (ECF No. 30-1).  In relevant part,  Entrust's Risk Policy mandated that Entrust create

load forecasts.  Based on the load forecast, Entrust would report to Shell if Entrust's hedging fell out of certain, prescribed ranges.[1]  Entrust was required to seek the approval of certain Entrust principals (e.g., the CEO or VP of Finance) to engage in supply transactions that would restore the hedging to the prescribed ranges.

Section 7.1 of the Global Agreement defines "Event of Default" to mean, among other things, Entrust's violation of the Risk Policy provision or Entrust becoming bankrupt.  (ECF No. 30-1 at 13).

Section 10.12 of the Global Agreement provides that any communication or notice required under the EEI must adhere to the noticing requirements in that agreement.  If the relevant Transaction Agreement lacks particularized notice requirements, then

> such notice or other communication shall be in writing and may be delivered by hand delivery, overnight courier service, facsimile or e-mail.  Notice by facsimile, e-mail or hand delivery shall be effective as of the close of business on the day actually received, if received during business hours on a Business Day, and otherwise shall be effective at the close of business on the next Business Day.

(ECF No. 30-1 at 18).  The Global Agreement provides specific addresses to which notice must be sent.  (ECF No. 30-1 at 19).

The Cover Sheet to the EEI incorporates the term "Event of Default" as defined in the Global Agreement.[2]  (ECF No. 30-2 at 6).  It adds to the definition

> the failure to perform any material covenant or obligation set forth in this Agreement (except to the extent constituting a separate Event of Default, and except for such Party's obligations to deliver or receive the Product, the exclusive remedy for which is provided in Article Four) if such failure is not remedied within three (3) Business Days after written notice . . .

(ECF No. 30-3 at 18).

---

[1] A "load forecast" is a tool used by Entrust's risk management personnel to manage Entrust's supply obligations by creating a forecast of the volume of customer load obligations.  (ECF No. 154 at 66).

[2] The EEI is a "Transaction Agreement" as defined by the Global Agreement.  (ECF No. 30-1 at 49).

This language expressly carves out from the definition of Event of Default the failure to deliver Product.[3]  (ECF No. 30-3 at 18).  Instead, section 4.1 of the EEI deals with the parties' remedies for the failure to deliver or receive Product.  (ECF No. 30-3 at 17).  If Shell failed to deliver Product, Entrust could invoice Shell for the Replacement Price of getting the Product elsewhere.  These remedies do not include termination rights or the right to choose an Early Termination Date, which are remedies only available under Article 5.  (ECF No. 30-3 at 17).

Upon an Event of Default (capital "E," capital "D"), the Non-Defaulting Party has certain rights under section 5.2 of the EEI.  (ECF No. 30-3 at 19).  A party is considered the "Non-Defaulting Party" and endowed with such rights *only* in the event of a defined Event of Default. (ECF No. 30-3 at 19).  If an Event of Default occurs, the Non-Defaulting Party may

> designate a day, no earlier than the day such notice is effective and no later than 20 days after such notice is effective, as an early termination date ("Early Termination Date") to accelerate all amounts owing between the Parties and to liquidate and terminate all, but not less than all, Transactions (each referred to as a "Terminated Transaction") between the Parties, (ii) withhold any payments due to the Defaulting Party under this Agreement and (iii) suspend performance.

(ECF No. 30-3 at 19).

The EEI then directs the Non-Defaulting Party to "calculate, in a commercially reasonable manner, a Settlement Amount for each such Terminated Transaction as of the Early Termination Date." (ECF No. 30-3 at 19).  The Settlement Amount is netted against any amounts owed by the Non-Defaulting party to the Defaulting Party to arrive at a Termination Payment amount.  (ECF No. 30-3 at 19).  The Non-Defaulting Party must then provide notice to the Defaulting Party of the Termination Payment amount, and payment must be made within two business days after effective notice.  (ECF No. 30-3 at 19).  The Defaulting Party may challenge the Termination Payment

---

[3] The EEI defines "Product" as "electric capacity, energy or other product(s) related thereto as specified in a Transaction by reference to a Product listed in Schedule P hereto or as otherwise specified by the Parties in the Transaction."  (ECF No. 30-3 at 14).

calculation within two business days of receipt of the Non-Defaulting Party's calculation if the

Defaulting Party provides a "detailed written explanation of the basis for such dispute."  (ECF No.

30-3 at 20).

Section 6.3 of the EEI provides that, if a party disputes an "invoice," any undisputed portion

of that invoice must still be made when due.  (ECF No. 30-3 at 21).

Section 10.7 (and the related amendments expressed in the cover sheet) lays out the proper

termination notice procedure under the EEI:

> All notices, requests, statements or payments shall be made as specified in the Cover Sheet.
> Notices (other than scheduling requests) shall, unless otherwise specified herein, be in
> writing and may be delivered by hand delivery, United States mail, overnight courier
> service or facsimile. Notice by facsimile or hand delivery shall be effective at the close of
> business on the day actually received, if received during business hours on a Business Day,
> and otherwise shall be effective at the close of business on the next Business Day. Notice
> by overnight United States mail or courier shall be effective on the next Business Day after
> it was sent.

(ECF No. 30-3 at 30).  The Cover Sheet provides the addresses for properly providing notice of

default or termination.  (ECF No. 30-2 at 2).

Finally, Shell and Entrust were counterparties to various financial agreements (loan

agreements, security agreements, a promissory note, etc.) which Entrust alleges afforded Shell a

high degree of control over Entrust's business.  (ECF No. 154 at 11-12).

## II.   WINTER STORM URI

ERCOT (the Electric Reliability Council of Texas) controls the electricity grid for the

entire state and oversees the markets that retailers use to purchase and sell energy.  (ECF No. 154

at 12).  ERCOT, for all intents and purposes, controls the price point for electric power across

Texas.  Rather than pay ERCOT-controlled market prices, many retailers elect to work with

wholesale suppliers, with which the retailer can negotiate a set (or at least more stable) price.  Shell

acted as a wholesaler: Entrust, a retailer, purchased its supply through Shell's wholesale business reselling the power to end users.  (ECF No. 154 at 12).

Winter Storm Uri hit Texas in February of 2021.  (ECF No. 154 at 12).  Uri forced ERCOT to make quick, difficult decisions regarding the balance between load (demand) and generation (supply) as the events of the storm unfolded.  (ECF No. 154 at 12).  Because of the high demand for electricity, prices soared to record levels.  (ECF No. 154 at 12).  Entrust alleges that throughout Uri, and in compliance with its internal Risk Policy, it entered into transactions with Shell in order to hedge against the increasing risks faced by retail providers that week.  (ECF No. 154 at 13). Not only does Entrust allege it accomplished this by securing most of its supply at a fixed price from Shell, but also by purchasing financial products from Shell designed to allow Entrust to hedge against price volatility regarding any additional supply it needed to purchase during the storm. (ECF No. 154 at 13).

According to Entrust, that was the whole benefit of engaging in this "one stop shopping" arrangement with a wholesaler like Shell.  By going through Shell, Entrust hedged against the risk of fluctuations in the power market to shield Entrust from such volatility.  (ECF No. 154 at 12). The arrangement also, at least in theory, insulated Entrust from the risk of not having enough product to distribute to end users by obligating Shell to provide product to it.  (ECF No. 154 at 14).  Entrust alleges that Shell exposed both itself and Entrust to risk during Uri by failing to properly hedge for its own needs.  (ECF No. 154 at 14).  Alternatively, Entrust alleges that, even if Shell properly hedged, it opportunistically terminated its agreements with Entrust in order to profit by exploiting the record setting prices in the real-time energy market.

Entrust alleges that it complied with the Risk Policy in the lead-up to Shell's termination notice, which merely required the reporting and approval of proposed hedging strategies if

Entrusts's hedging position fell outside a set range.  (ECF No. 154 at 18).  Entrust alleges that it reported its hedging position to the necessary individuals and Shell in accordance with the Risk Policy throughout the storm.  (ECF No. 154 at 18).  In fact, Entrust argues that it went beyond the requirements of the Risk Policy by continuing to prepare and report hedging analyses over the holiday weekend preceding Shell's termination, which was not strictly required by the Risk Policy. Throughout the storm, Entrust had open lines of communication and continued to respond to Shell's requests for information.  (ECF No. 154 at 18).  Entrust's CEO, VP of Finance, and VP of Supply continuously "exercised their business judgment" as required by the Risk Policy when hedging fell outside the set range.  (ECF No. 154 at 18).  At no time during this back and forth did Shell allege that Entrust had fallen out of compliance with its Risk Policy or otherwise allege that an Event of Default had arisen.  (ECF No. 154 at 18).

On Saturday, February 13, 2021, Shell allegedly received notice from one of its suppliers that it might suspend its delivery obligations to Shell as a result of a *force majeure*.  (ECF No. 154 at 19).  That same day, Entrust provided Shell with an update on its hedging position and informed Shell that it was in the process of acquiring additional energy supply in order to accommodate weather conditions which had increased demand overnight.  (ECF No. 154 at 19).

On Sunday, February 14, Shell requested another report from Entrust, which fell outside the routine reporting requirements of the Risk Policy.  (ECF No. 154 at 19).  Entrust complied with the request.  (ECF No. 154 at 20). Entrust's update contained language stating that Entrust was out of compliance with the Risk Policy's hedging requirements.  (ECF No. 154 at 20).  Entrust maintains that because this update fell outside the Risk Policy requirements and was merely in response to an "ad hoc" request from Shell, the language regarding Entrust being out of compliance was meaningless and did not mean that the approval of the CEO, VP of Finance, and VP of Supply

was required.  (ECF No. 154 at 20).  During this exchange, Shell did not allege that Entrust had failed to get necessary approval or ask for such approval.  (ECF No. 154 at 20).  Entrust further alleges that Entrust's senior management exercised business judgment and made "prudent decisions concerning any need for further hedging" throughout the lead-up to Shell's termination. (ECF No. 154 at 21).

That same Sunday, Shell "encouraged Entrust to agree to a mutual termination of the parties' contracts." (ECF No. 154 at 21).  Entrust did not agree to the termination.  (ECF No. 154 at 22).  Shell expressed its belief that it had the ability, at that time, to declare a default under the contracts and terminate the contracts without Entrust's consent.  (ECF No. 154 at 22).  Shell has allegedly since admitted that the "technical default was [Shell's] own misinterpretation of the phrase 'out of compliance'" in the ad hoc update. (ECF No. 154 at 22).  Regardless, at 10:55 P.M., Shell issued the Termination Notice to Entrust alleging material default under section 3.17 of the Global Agreement (the Risk Policy requirement).  (ECF No. 30-4 at 2).  The Termination Notice purported to terminate all of Shell's obligations immediately rather than select an Early Termination Date.  (ECF No. 30-4 at 2).  It terminated the EEI, including any outstanding transactions and Shell's lending obligations under the various agreements, based on an alleged Entrust Event of Default under the Global Agreement.  (ECF No. 30-4 at 2).  Beyond claiming that an Event of Default had occurred from the alleged failure to comply with section 3.17, the Termination Notice contained no explanation of how or why Shell believed Entrust to be out of compliance with its Risk Policy.  (ECF No. 30-4 at 2).  Entrust alleges that the Notice was devoid of such detail because Shell knew that Entrust had not actually Defaulted under the agreements and was seeking to improperly terminate the agreements to take advantage of the price surge.  (ECF

No. 154 at 23).  The Termination Notice further claimed that Entrust was not financially viable and "deeply insolvent."  (ECF No. 30-4 at 2).

Shell delivered the Termination notice to Entrust's CEO and General Counsel, both via email and to the physical address specified in the Global Agreement.  (ECF No. 30-4 at 2).

On March 9, Shell sent an email to Entrust claiming that Shell was the Non-Defaulting Party and stating the amount of the Termination Payment owed to Entrust by Shell.  (ECF No. 154 at 34).  On March 10, Entrust responded, asking for clarification and a more detailed calculation for the basis of Shell's Termination Payment amount.  (ECF No. 154 at 35).  Shell responded to the request on March 16 and did not attempt to claim that Entrust had waived its contractual right to challenge the calculation by requesting more detail.  (ECF No. 154 at 36).  Nor did Shell pay the Termination Payment per its own calculation within the two business days allotted by the contract provisions.  (ECF No. 154 at 36).  Instead, Shell continued to negotiate the issue with Entrust over several months.  (ECF No. 154 at 36).

Based on the above allegations, Entrust alleges Shell improperly terminated the relationship between the two entities, ultimately causing Entrust to spiral out of financial viability and to land in chapter 11.  (ECF No. 154 at 22).  Entrust alleges that it would have been hedged beyond its needs had Shell not improperly terminated the agreements.  (ECF No. 154 at 27).  The result of such improper termination, according to Entrust, was to render Entrust the Non-Defaulting Party under the agreements, with the right to choose the Early Termination date.

## III.    PROCEDURAL HISTORY

Entrust filed its chapter 11 bankruptcy petition on March 30, 2021.  (ECF No. 154 at 36).  Entrust's filings reflect that as of the petition date, Entrust was still in the process of resolving its issues with Shell's Termination Notice and calculation of the Termination Payment.  (ECF No.

154 at 36).  The parties continued to negotiate during the pendency of the bankruptcy proceedings. (ECF No. 154 at 36).  On August 18, 2021, Entrust invoiced Shell for $124,282,817, its own calculation of the Termination Payment based on Entrust's selection of February 17, 2021 as the Early Termination Date under its contention that Entrust is the Non-Defaulting Party.  (ECF No. 154 at 37).  Entrust claims that this invoice was sent "in accordance with Section 4.1(b)" of the EEI.  (ECF No. 154 at 37).  Shell has not, to date, paid any amount under either the Entrust Invoice or Shell's own Termination Payment Calculation, including the portion of that payment which Entrust argues is "undisputed," which reflects the "minimum" amount owed by Shell, based on Shell's own calculation, was $8,267,036.

Entrust filed this adversary proceeding, seeking recovery from Shell based on its allegedly wrongful termination of the agreements under several theories of recovery.  Entrust's complaint brings claims for: (i) breach of contract; (ii) declaratory judgment; (iii) disallowance of the Shell proofs of claim under 11 U.S.C. § 502(d); (iv) turnover of estate property (the allegedly "undisputed" portion of the Termination Payment) under 11 U.S.C. §§ 105(a), 541, and 542(a) and (b); (v) equitable subordination of Shell's claims under 11 U.S.C. § 510(c); (vi) breach of the implied duty of good faith and fair dealing; and (vii) avoidance and recovery of fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(A) and 550.  (ECF No. 154 at 41-54).

Shell filed a partial motion to dismiss the complaint, asking the Court to (i) dismiss Entrust's assertions in the breach of contract and declaratory judgment claims that Entrust is the "Non-Defaulting Party" and (ii) dismiss all claims other than the breach of contract claim in their entirety under Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 157 at 6).  A hearing was held on Shell's motion on March 23, 2023.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) affords defendants relief from a plaintiff's defective complaint.  FED. R. CIV. P. 12.  Federal Rule of Bankruptcy Procedure 7012(b) applies Rule 12(b) to adversary proceedings.  FED. R. BANKR. P. 7012(b).  A complaint is "defective" where it fails to state a claim for relief under Rule 8.

To defeat a 12(b)(6) motion, the plaintiff must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A complaint plausibly states a claim for relief when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "Plausibility," at the Rule 12(b)(6) stage, does not mean "possibility."  *Id.* at 679.  A complaint that offers bare legal conclusions, unsupported by well-pleaded factual allegations tending to establish a plausible basis for relief, must be dismissed.  *See id.* at 679–80 (citing *Twombly*, 550 U.S. at 551, 555, 565–67, 570) (explaining that legal conclusions cannot be taken as true without factual support).  The Court reviews motions under Rule 12(b)(6) "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs."  *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007).

## DISCUSSION

Entrust plausibly pleads a factual basis to support its conclusion that it was the Non-Defaulting Party under the EEI.  Entrust fails to state a plausible factual basis to support its claims for relief other than the breach of contract claim.

I.       ENTRUST PLAUSIBLY PLEADS IT IS THE "NON-DEFAULTING PARTY"

In its motion to dismiss, Shell does not allege that Entrust's Risk Policy did not comply with the requirements of the Global Agreement.  Rather, Shell alleges that, at a certain point during Uri, Entrust fell out of compliance with its Risk Policy or became bankrupt.  The complaint contains enough well-pled factual allegations to support Entrust's theory that it was the Non-Defaulting Party under the agreements.

A.  Entrust Plausibly Pleads that there was no Entrust Event of Default

To require a party to anticipate and overcome any possible counter argument or defense a defendant might raise at the pleading stage would run counter to the notice-pleading purpose of the Rule 8 standard.  "The failure-to-state-a-claim inquiry typically focuses on whether the plaintiff plausibly alleges the elements of a claim."  *Bell v. Eagle Mt. Saginaw Indep. Sch. Dist.*, 27 F.4th 313 at 320 (5th Cir. 2022).  The Fifth Circuit noted in *Bell* that Rule 12(b)(6) dismissal is appropriate if a defense which would be "fatal to the claim" is apparent on the face of the complaint itself.  *Id*.

Shell does not argue that it did not terminate the agreement, but rather that it did not do so *wrongfully*.  At the hearing on the motion to dismiss, Shell claimed it properly terminated the agreement because Entrust's alleged breach of the Risk Policy was an Event of Default.  That is not a deficiency in Entrust's complaint; that is a defense raised by Shell—unless the defense is "fatal to the claim" and apparent on the face of the complaint.  To the contrary, throughout the complaint, Entrust argues (relying on well-plead factual allegations) that it was in compliance with the Risk Policy.  According to Entrust, the policy did not require Entrust to stay within a certain hedging range, but rather to report to and seek approval from its principals when its hedging

position fell outside a set range.  This is supported by the Risk Policy attached to Entrust's complaint and the language in the agreements.

One of the representations and warranties in the Global Agreement is that Entrust had adopted a Risk Policy in compliance with the requirements of section 3.17 of that agreement.  (ECF No. 30-1 at 3).  Section 3.17 of the Global Agreement required written approval from Shell to modify the Risk Policy.  (ECF No. 30-1 at 7).  It required Entrust to "enter into supply purchase transactions reasonably approximated" to match its forecasts, which took "into consideration historical consumption, customer load forecasts, attrition rates, weather influences . . . and any other factors."  (ECF No. 30-1 at 7).  It prevented Entrust from hedging for speculative purposes. (ECF No. 30-1 at 7).  Finally, it required Entrust to "at all times abide by the Risk Process and Procedures Guidelines, and provide updates thereto as required by the Reporting Requirements." (ECF No. 30-1 at 7).  The Global Agreement defines "Risk Process and Procedures Guidelines" as Entrust's own written guidelines concerning the procedure it uses to "identify and measure commodity risk."  (ECF No. 30-1 at 33).  The Global Agreement defines "Reporting Requirements" as the periodic reporting required by an appendix to the agreement.  (ECF No. 30-1 at 33).  The Reporting Requirements encompassed a broad range of financial information, a yearly update of the Risk Policy, and "such other information as Shell Energy may reasonably request from time to time, including the financial risk management committee reports and other information" which Entrust had historically provided to Shell upon request.  (ECF No. 30-1 at 45).

Based on this language, the Court agrees with Entrust that, absent some showing of evidence to the contrary, the Global Agreement itself does not set hedging parameters.  It merely requires Entrust to adopt internal procedures and parameters and to report information to Shell, either as a matter of course or upon request from Shell.  The Risk Policy itself sets hedging

parameters, but nowhere does it provide that Entrust is in default under the Global Agreement merely because its hedging position temporarily falls outside those parameters. (ECF No. 154 at 60-74).

The Global Agreement provided that Entrust "shall at all times comply with the Risk Policy" it adopted. Perhaps Shell reads that language to mean that falling out of the hedging range would amount to noncompliance with the Risk Policy and therefore an Event of Default. The Risk Policy itself is silent as to what would constitute breach of the Policy, especially because it primarily sets goals and guidelines for its internal risk management objectives. [4] (ECF No. 154 at 160-174). The only thing, by its plain language, the Risk Policy appears to affirmatively require Entrust to do is exercise its business judgement with respect to maintaining a hedging position within a certain range and seek approvals and make reports when its position falls outside that range. (ECF No. 154 at 160-174). For example, under the Risk Policy, "[h]edging strategies that leave Committed Load unhedged beyond existing volumetric limits require approval by" certain principals.[5] (ECF No. 154 at 67).

Entrust alleges that it not only made the reports and sought the approvals necessary, but also that it made additional reports at Shell's request and continued to loop in its senior management team even at times when their approval was not required by the Risk Policy. (ECF No. 154 at 16). Entrust further alleges that this interpretation of what the Risk Policy required is supported by two years of course-of-conduct evidence. (ECF No. 20). Shell may provide evidence

---

[4] There is a provision of the Risk Policy which provides an internal procedure in the event of a breach of the Policy. (ECF No. 154 at 68). However, that provision seems only to contemplate an employee breach of her duties under the Risk Policy and not the possibility of Entrust breaching the policy as it provides for remedies like "warning letters for the employee's HR file." (ECF No. 154 at 68).

[5] The "FRMC" is the Financial Risk Management Committee, which is comprised of the senior management members at Entrust who were allegedly in constant communication with each other and officials at Shell during Uri.

to challenge that interpretation, and the Court may decide in favor of Shell on this point at trial. But this is not a dispute that should be decided on a 12(b)(6) motion to dismiss. The complaint plausibly pleads a factual basis to support Entrust's interpretation of the agreements on this point.

In its briefing, Shell raises the alternative argument that an Event of Default occurred because Entrust was "deeply insolvent," as noted in its Termination Notice. (ECF No. 30-4 at 2). The Global Agreement provides that it is an Event of Default if Entrust "becomes Bankrupt." (ECF No. 30-1 at 14). "Bankrupt" means, among other things, that a party "shall . . . become unable, admit in writing its inability or fail generally to pay its debts as they become due." (ECF No. 30-1 at 26). Whether Entrust was actually "bankrupt" under this definition is a fact issue disputed by Entrust. Therefore, it is not appropriate to dismiss Entrust's claim that it was not bankrupt and therefore not the Defaulting Party. Of course, the allegation that Shell makes must necessarily prove that Entrust was "bankrupt" before it filed its bankruptcy petition. By the date of the petition, Shell had already acted based on the alleged bankruptcy Default.

**B. Entrust Plausibly Pleads that Shell's Termination was an "Event of Default"**

The thrust of Shell's argument in its motion to dismiss Entrust's assertion that it was the Non-Defaulting Party is that even if Shell's actions on February 14, 2021 were wrongful, they constituted ordinary "default," not a defined "Event of Default." If the complaint does not plausibly plead that there was an "Event of Default" by Shell, Entrust has not plausibly plead that Entrust is the Non-Defaulting Party, so this assertion should be dismissed. However, the complaint plausibly pleads that Shell's termination was an Event of Default.

Shell's Termination Notice claimed that an Event of Default (the Risk Policy default) had occurred under the Global Agreement. (ECF No. 30-4 at 2). Shell then stated it was terminating the EEIs, its Scheduling Coordinator Agreements, and its lending commitments under the Loan

Agreement as a result of the Event of Default.  (ECF No. 30-4 at 2).  Shell purported to terminate these commitments "immediately" and sent notice to that effect.  (ECF No. 30-4 at 2).  Entrust argues that this termination was wrongful and therefore itself a material breach constituting an Event of Default for four primary reasons: (i) Shell was not the Non-Defaulting Party with a termination right to begin with, or even if it was (ii) it had no right to terminate the agreements "immediately," (iii) Shell did not comply with the notice provision of the EEI, and (iv) Shell's calculation of the Termination Payment was not properly detailed nor was it "commercially reasonable."

Section 5.2 of the EEI provides that after an Event of Default, the Non-Defaulting party has the right to terminate the agreements.  For the reasons expressed above, Entrust plausibly alleges that there was no Entrust Event of Default, so Shell was not the Non-Defaulting Party and did not have the right to terminate the agreements.  Because the termination was wrongful, the termination was itself an Event of Default, which would give Shell the right to choose the Early Termination Date.  Shell argues that even if the termination was wrongful, section 5.2 (which grants rights to the Non-Defaulting Party) should not govern here because Shell's wrongful termination was not an Event of Default as defined in the EEI.  Instead, Shell argues that its default merely constituted a failure to deliver product, which is expressly carved out of the definition of "Event of Default."

Shell's argument fails at the motion to dismiss stage.  The remedies for failure to deliver product are housed in Article 4 of the EEI, and they do not include the right to choose the Early Termination Date.  (ECF No. 30-3 at 17).  It is possible that Shell may introduce course of conduct or other evidence or argue that this is the correct way to view its actions at trial.  But on the face of Entrust's complaint—and as evidenced by the Termination Notice itself—Shell did much more

than merely fail to deliver product.  It also immediately terminated the Scheduling Coordinator agreements and its lending obligations under the Loan Agreements.  Shell's relationship with Entrust involved more than the obligation to deliver product.  There were financial aspects to the arrangement which, alongside the promise to provide product in the future, encompassed a broader, more intricate relationship between the parties than that of a seller and buyer.  This understanding is reflected, for example, by the extensive financial and risk reporting requirements and other oversight mechanisms which bound Entrust to Shell.  None of that would reasonably be required if the total of Shell's relationship to Entrust was supplying product.  Shell's termination of its commitments to Entrust necessarily involved more than failing to deliver product.

To be clear, Shell did not merely fail to deliver product.  Such a failure could occur unintentionally or negligently.  Shell announced that it would never again deliver product or meet any other obligations under its agreements with Entrust.  The Court will await evidence on whether such a wholesale breach constituted more than a failure of delivery and transcended into an Event of Default.

The context of the failure-to-deliver carveout and the language of Article 4 of the EEI further reveal that what Shell attempted to do with the Termination Notice went beyond what the contracts considered the "failure to deliver . . . the product."  Article 4 provides the remedy if Shell fails to deliver product.  (ECF No. 30-3 at 17).  That provision contemplates Shell paying Entrust the difference between what Entrust would have paid shell and the "Replacement Price" that Entrust had to pay some third party as a result of Shell's failure to deliver.  (ECF No. 30-3 at 17).  Shell did not fail to deliver product at one instance for which it was now seeking to pay damages, which is the situation the language arguably contemplates.  Shell terminated all existing delivery requirements and indicated that it would not transact with Entrust under the EEI at all moving

forward.  (ECF No. 30-4 at 2).  If Shell's contention that section 4.1 is the only proper provision under which Entrust may recover, then the contract would leave completely unaccounted for Entrust's damages for Shell's wrongful termination not only of its delivery obligations, but also its provision of other obligations under the EEI.

Entrust has plausibly plead that Shell's breach was an Event of Default, not just a failure to deliver.

### C.  Shell's Termination Did Not Plausibly "Supersede" an Entrust Event of Default

Entrust argues that even if Shell was the Non-Defaulting Party, Shell's attempt to exercise its rights was flawed in a manner that itself constituted an Event of Default which "superseded" Entrust's breach of the Risk Policy.  First, notice of the termination was allegedly improper because it was not sent to the addresses specified on the cover sheet of the EEI as required by the Global Agreement and EEI.  Second, the Non-Defaulting Party does not have the right to terminate the agreement "immediately," as Shell purported to do.  Third, Shell's calculation of the Termination Payment was not "commercially reasonable" and was not explained in detail, as required by the agreements.  The complaint plausibly pleads these allegations with respect to the faults in the termination notice.

Shell emailed its Termination Notice to the parties specified in the Global Agreements although it purported to terminate the EEI.  (ECF No. 30-4 at 2).  The EEI required the notice to two particular email addresses since it intended to notice an Event of Default.  (ECF No. 30-2 at 2).  The notice was instead sent to the proper noticing emails for termination under the Global Agreement.  (ECF No. 30-1 at 19).

Further, the February 14 Termination Notice claimed to terminate the agreements "effective immediately."  (ECF No. 30-4 at 2).  Entrust alleges that Shell in fact did cease to

perform its obligations immediately.  This timing was improper because section 5.2 gave the Non-Defaulting Party the right to terminate effective "no earlier than the day" of effective notice.  (ECF No. 30-3 at 19).  Notice by email (the method Shell used) was "effective at the close of business on the day actually received, if received during business hours on a Business Day, and otherwise shall be effective at the close of business on the next Business Day."  (ECF No. 30-3 at 30).  The EEI defines "Business Day" to exclude Sundays and Federal Reserve Bank Holidays.  (ECF No. 30-3 at 10).  Shell sent the email on Sunday, February 14.  (ECF No. 30-4 at 2).  The next day, February 15, was Martin Luther King, Jr. Day—a bank holiday.  The earliest effective termination date which Shell could have chosen was the close of business on February 16.  (ECF No. 154 at 30).

As a result, Entrust argues Shell's improper procedure was an Event of Default which "superseded" the Entrust Event of Default "under applicable New York law."  (ECF No. 154 at 33).  The complaint does not actually cite to the applicable case law supposedly supporting this proposition.  Entrust can cite no provision in the contract suggesting that a failure to properly exercise its rights as the Non-Defaulting Party somehow strips the party of that title and renders the defaulting party the new Non-Defaulting Party.

The Court finds that the complaint is not plausible to the extent it argues that even if an Entrust Event of Default occurred, Shell's failure to properly exercise its rights as the Non-Defaulting party somehow made Entrust the Non-Defaulting Party.  But because Entrust has plausibly plead that it is the Non-Defaulting Party on other grounds (see above), the motion to dismiss Entrust's allegations that it is the Non-Defaulting Party is denied.

## II.   THE CLAIMS FOR DECLARATORY RELIEF ARE DISMISSED

The decision to grant declaratory relief is within the Court's discretion. *Env. Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 523 (5th Cir. 2016) (citing *United Teacher Assoc. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 569 (5th Cir. 2005)).  The Court looks to two criteria in exercising its discretion: (i) whether "the judgement will serve a useful purpose in clarifying and settling the legal relations in issue,'" and (ii) whether "'it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Concise Oil & Gas Partn. v. Louisiana Intrastate Gas Corp.*, 986 F.2d 1463, 1471 (5th Cir. 1993) (citing *Sandefer Oil & Gas, Inc. v. Duhon*, 871 F.2d 526, 528 (5th Cir.1989)).  The Fifth Circuit recognizes that "a declaratory judgment may not serve a 'useful purpose' when a fact-finder has already 'settled the legal relations in issue.'" *Env. Texas Citizen Lobby*, 824 F.3d 523.  For example, the Fifth Circuit found that it does not serve a "useful purpose" to issue a declaratory judgment that a contract existed in a breach of contract action because finding that a contract existed would be necessary to adjudicating the breach of contract issue itself. *See Concise Oil*, 986 F.2d 1463.  Such relief would be duplicative and an inefficient use of the Court's resources. *Id*.

Entrust's declaratory relief claims are duplicative in a comparable way to those in *Concise Oil*.  Entrust asks the Court to issue a declaratory judgment:

> (i) that Shell had a contractual obligation to deliver power to Entrust under the EEI Master Agreements that was not affected by the February 14, 2021 Termination Notice, (ii) that Shell's actual termination or alleged suspension of Transactions on February 14, 2021, which directly caused the cessation and collapse of Entrust's business and harm to all other creditors was a material breach of contract that supersedes any prior alleged or actual Entrust Event of Default, and renders Entrust – and now the Trust – the Non-Defaulting Party; (iii) that Entrust did not waive its rights to challenge the Shell Calculation by requesting more information, (iv) that Shell's delivery of its Shell Calculation could not lead to a waiver of any rights by Entrust because Shell was not the Non-Defaulting Party when it delivered the Shell Calculation; and (v) that Shell waived any claim that the Shell

> Calculation was final, or that the Shell Calculation designated an Early Termination Date, by entering into a period of negotiation and information sharing with Entrust, by not formally declaring the Shell Calculation to be unchallenged, and by failing to pay the Undisputed Amount within the time required by the EEI Master Agreements for final Termination Payment calculations.

(ECF No. 154 at 46).  The requested declarations can be characterized in one of two ways.  Each is either a factual finding that the Court must necessarily make in determining the breach of contract issue or a legal theory Entrust may argue to support its claims for breach of contract.  In either case, it is duplicative of the relief sought in the breach of contract action.  Issuing the declaratory relief sought by Entrust will not afford Entrust any greater relief if it prevails in the breach of contract action.  If Entrust cannot prevail on the breach of contract issue, the declaratory relief would serve no purpose as the parties have no ongoing contractual relationship.

The Court declines to exercise its discretion to grant the declaratory relief requested by Entrust.  The claims for declaratory relief are dismissed.

## III.   THE CLAIM FOR BREACH OF THE IMPLIED DUTY OF GOOD FAITH IS DISMISSED

New York law reads a duty of good faith and fair dealing into all contracts.  *State St. Bank and Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004) (citing *1-10 Indus. Associates, LLC v. Trim Corp. of Am.*, 747 N.Y.S.2d 29, 31 (N.Y. App. Div. 2d Dept. 2002)).  The duty requires that neither party act to impede the other from performing its obligations or receiving benefits it is owed under the contract.  *Id.*  (citing *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002)).  The duty of good faith and fair dealing cannot conflict with the plain terms of the contract.  *Id.* at 170.  Though the duty exists, New York law

> does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also plead. . . .   Therefore, when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant.

*Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013)(citing *L–7 Designs, Inc. v. Old*

*Navy, LLC*, 647 F.3d 419, 434 n. 17 (2d Cir.2011)).

Throughout the complaint, there are factual allegations addressing Shell's performance or failure to perform under the agreements. All those allegations go to the breach of contract claims and the explicit duties Shell owed to Entrust. There is nothing concrete in the complaint to support Entrust's allegations that Shell acted to impede Entrust from performing its duties or receiving benefits it was owed under the contract separate from the alleged wrongful termination. As written, it is unclear from the face of the complaint what exactly Entrust alleges Shell did that breached its implied duty of good faith and fair dealing that is not already accounted for by the breach of contract claim.

The only evidence (or would-be-evidence) Entrust cites to support its allegations that Shell breached this duty is that maybe Shell had some motivation to terminate the contracts for reasons other than an Entrust Event of Default. Entrust alleges that Shell's actions were motivated by one of two things. In one scenario, Shell failed to properly hedge for its own needs and was unable to deliver the Product it had committed to Entrust. In the other, Shell properly hedged for its own needs, but sought to exploit the increased market prices to turn a massive profit if it were no longer beholden to sell Product to Entrust at the set rate. Beyond this speculation concerning Shell's motivations, Entrust offers nothing concrete other than the hope that discovery will reveal some evidence to support one theory or the other. If Shell wrongfully terminated the agreement, Entrust will be able to recover damages for breach of contract. If Shell did not wrongfully terminate the agreement, it is neither here nor there what its motivation to do so was.

The breach of the implied duty claim is dismissed. Leave is granted to replead this claim, supported by well-pled facts.

### IV.    THE TITLE 11 CLAIMS ARE DISMISSED

For the reasons stated below, Entrust's claims under Title 11 of the Bankruptcy Code fall short of the relevant pleading standards and are dismissed.

### A.  Turnover of Estate Property (11 U.S.C. §§ 105(a), 541, 542(a),(b))

Entrust argues that the "undisputed" portion of the claim which represents the overlap between Shell's calculation of the Termination Payment and the damages Entrust seeks to recover in this proceeding is property of the estate which Shell must hand over.  The Bankruptcy Code broadly defines property of the estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  While there are code-specified exceptions to what property counts as "estate property," none of those exceptions apply here.  Section 542 of the Code requires the turnover of estate property to the debtor in possession. § 542(a),(b).

The problem with Entrust's argument is that Shell's calculation of the Termination Payment is not estate property subject to turnover.  A bona fide dispute exists as to both the amount and nature of the payment owed to Entrust by Shell.  The turnover provisions of the Bankruptcy Code cannot be used to convert a disputed payment into estate property.  Entrust's attempt to classify the payment as an "*undisputed* portion of an invoice" by invoking language from the EEI fails to overcome this flaw in its argument.

The EEI provides that, in the event that there is a dispute over an invoice amount, "payment of the undisputed portion of the invoice shall be required to be made when due."  (ECF No. 30-3 at 21).  Entrust alleges it "invoiced" Shell in the amount of $124,282,817 "in accordance with Section 4.1(b) of the EEI Master Agreements."  (ECF No. 154 at 37).  Entrust also alleges that Shell concedes that the minimum amount of the Termination Payment is $8,267,036.  (ECF No.

154 at 48).  Entrust argues that Shell's calculation of its Termination Payment (which Shell has not paid) represents the "undisputed portion" of the invoice Entrust sent to Shell in August 2021. On this factual basis, Entrust argues that the supposed undisputed portion is estate property which Shell must hand over immediately rather than after resolution of this dispute.

Neither "invoice" nor "undisputed portion" are defined terms in the EEI.  By contrast, the EEI treats the phrase "Termination Payment" as a defined term of art.  There is only a Termination Payment if there is an Event of Default, in which case Article 5 applies.  (ECF No. 30-3 at 17-19). Article 5 provides for "Termination Payments," not invoices.  (ECF No. 30-3 at 17-19).  The term "invoice" is used in Article 4 but not Article 5.  (ECF No. 30-3 at 17).  In Article 4, the term "invoice" is used to reference an invoice sent for the Replacement Price—the amount a party would recover for the failure to deliver/receive Product.  (ECF No. 30-3 at 17).  A Termination Payment calculates a "Settlement Amount," which involves different inputs than the Replacement Price calculation Entrust would invoice under Article 4.  (ECF No. 30-3 at 17, 19).

Shell purported to calculate a Termination Payment.  Entrust claims that it sent Shell an "invoice" pursuant to Article 4, which would make it a calculation of a Replacement Price.[6]  Even if it was plead as an alternative theory of recovery which would only apply in the case that the Court finds this is a dispute governed by Article 4 and not Article 5, the fact that there is a roughly $8 million overlap in proposed recovery for Entrust is irrelevant.  Entrust has not argued that the

---

[6] Entrust spent the majority of its complaint explaining why Article 4 would not apply to this situation because the proper section to consider under these circumstances is Article 5.  This internal inconsistency is not resolved by Entrust's attempt to characterize the invoice as its own calculation of the Termination Payment—not when the rest of the complaint characterizes the issue as *either* a "failure to deliver" for which the damages are the Replacement Price *or* an Event of Default for which a Termination Payment is due. Maybe there is a theory under which Entrust could recover under both sections, but Entrust has not plead that theory.  The inconsistency makes unclear the exact basis upon which Entrust calculated the amount it claims in damages.

parties agree that there is, at minimum, an $8 million Replacement Price calculation (which would be an "undisputed portion of an invoice") because Shell has not proffered a Replacement Price.

There is a Termination Payment calculation payment proffered by Shell and an invoice for the Replacement Price proffered by Entrust.  Even if Entrust's invoice calculation could be classified as its calculation of the Termination Payment, there is no language in the EEI which provides for the recovery of undisputed portions of Termination Payments—only invoices.[7]

The provision of the EEI which requires a party to pay an undisputed portion of an invoice does not apply on the face of the complaint.  The claim for turnover of estate property is dismissed. Leave is granted to replead this claim, supported by well-pled facts.

### B.  Disallowance of the Shell Proofs of Claim (11 U.S.C. § 502(d))

The Bankruptcy Code states that the Court must

> disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title . . . , unless such entity or transferee has paid the amount, or turne over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d).  Entrust has not plausibly plead its claim for the turnover of estate property under § 542.  Because the complaint fails to state a claim under § 542, the claim for the disallowance of Shell's claims under § 502(d) is dismissed, subject to reinstatement if the § 542 claim is properly re-pled.

### C.  Equitable Subordination (11 U.S.C. § 510(c))

Entrust next asks the Court to subordinate Shell's claims against the estate under § 510 of the Code because "Shell engaged in inequitable conduct" and "each of Shell's affiliates that has filed one or more of the Shell Claims operated as the alter ego, agent, and instrument of Shell at

---

[7] Which is perhaps why Entrust classifies it as an invoice in its complaint.

all relevant times."  (ECF No. 154 at 50).  The complaint offers no factual basis for its theory that Shell was motivated to take advantage of the real-time markets in order to realize a larger profit than it could under its agreements with Entrust, the supposedly "inequitable conduct."  The prayer for relief is the first time Entrust makes any mention of Shell entities with claims against the estate operating as an "alter ego" of the same Shell entity against which relief is sought in this action. Based on this lack of factual support, the claim for equitable subordination is mere speculation and is dismissed.  Leave is granted to replead this claim, supported by well-pled facts.

### D.  Avoidance and Recovery of Fraudulent Transfers (11 U.S.C. §§ 548(a)(1)(A), 550)

Entrust alleges that certain fraudulent transfers occurred.  Specifically, the complaint provides that

> [b]y improperly calculating the Shell Calculation, and by unilaterally carrying out the Wrongful Setoff described above, Shell wrongfully reduced the Shell Calculation from the amount that should have been recognized as the undisputed amount owed to the estate, and intentionally by Wrongful Setoff caused a transfer of property of the Entrust estates over which Shell had control . . . to themselves, with the intent to defraud the estates' other creditors.

(ECF No. 154 at 52).  Based on this allegation, the complaint states that the Entrust is entitled to "recover from Shell an amount to be determined at trial that is not less than the total amount of the Transfers."  (ECF No. 154 at 54).

It is unclear from the complaint exactly what Entrust alleges the "Wrongful Setoff described above" was or what actions constituted "Transfers."  The complaint alleges that Shell had control over Entrust accounts and that Shell "wrongfully reduced the Shell calculation" by, presumably, the amount Shell determined was subject to setoff.  This is not enough information upon which the Court or Shell could reasonably be expected to understand exactly what setoff occurred that Entrust argues constitutes a fraudulent transfer.

Entrust also provides no support for its contention that the "Wrongful Setoff" was done with the "intent to defraud." Parties alleging fraud must plead "with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). In the Fifth Circuit, this means pleading, with particularity, the "who, what, when, where, and how" of the alleged fraud. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008). This heightened standard applies to claims for actual fraudulent transfer under 11 U.S.C. § 548. *In re Northstar Offshore Group, LLC*, 616 B.R. 695, 733 (Bankr. S.D. Tex. 2020). Entrust claims that Shell's setoff constituted an actual fraudulent transfer because Shell acted with the "intent to defraud," but offers no evidence and pleads no particular basis to support the fraudulent transfer claim.

Finally, the theory of recovery for this count is based on Entrust's arguments that there is an "undisputed" portion of a payment constituting estate property which Shell owed to Entrust under the EEI. Based on the analysis provided above, the complaint does not plausibly plead this allegation. There is no well-plead factual basis for the fraudulent transfer claim.

These counts are dismissed for failure to provide a basis upon which Shell (or the Court) can determine what transfers the trust seeks to avoid. To the extent the avoidance action is based on alleged fraudulent behavior, the complaint fails to meet the heightened pleading standard. Leave is granted to replead this claim, supported by well-pled facts.

## CONCLUSION

A separate order will be entered.

SIGNED 06/06/2023

Marvin Isgur
United States Bankruptcy Judge